Case No. 25-1923

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

CAPTAIN TOMAS BUSTO ÁLVAREZ; CAPTAIN CARLOS E. RAMOS; CAPTAIN RAY DÍAZ; CAPTAIN JACOB ELMSTROM; CAPTAIN RICHARD FLYNN CARO; CAPTAIN CARLOS GUTIÉRREZ; CAPTAIN PATRICK LÓPEZ, AND SAN JUAN BAY PILOTS CORPORATION,
Plaintiffs-Appellees,

v.

NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY; PILOTAGE COMMISSION OF PUERTO RICO; ATTORNEY JESSICA ÑECO MORALES, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF THE PILOTAGE COMMISSION,
Defendants-Appellants

_____

On Appeal from the United States District Court
For the District of Puerto Rico

_____

**EMERGENCY MOTION TO STAY
INJUNCTION PENDING APPEAL**

_____

J. RAMON RIVERA-MORALES
*Attorney for Appellant NFEnergia LLC*
*Midtown Building 4th Floor*
*420 Ponce de León Ave.*
*San Juan, PR 00918*
*Tel. 787-510-8090 email:* rrivera@jgl.com

# I. INTRODUCTION

Appellant, NFEnergia LLC, respectfully requests an emergency stay pending appeal of the district court's preliminary injunction, Dkt. 52, preventing NFE from supplying natural gas as fuel for the electric power generation plant in San Juan, Puerto Rico. The effect of the Injunction could have catastrophic consequences for Puerto Rico's energy supply.

The emergency arises because this Sunday, September 28, 2025, the LNG tanker M/V *Energos Maria* must depart from her berth in San Juan Harbor, and the LNG tanker M/V *Energos Princess* must enter the harbor to be docked at the same berth. The Injunction is contrary to the United States Coast Guards' Captain of the Port Orders that prescribe navigation safety conditions expressly applicable to transits of M/V *Energos Princess* and M/V *Energos Maria* in San Juan Harbor. If the Injunction remains in place, it will prevent these vessel movements and cause supply of natural gas fuel for the power generation plant to be cut off, and this could cause catastrophic consequences for Puerto Rico's energy supply.

The Injunction erroneously imposes navigation restrictions for LNG tankers in San Juan Harbor that are contrary to safety conditions imposed by the United States Coast Guard Captain of the Port, Sector San Juan, and contrary to directives of the Puerto Rico Pilotage Commission. The Injunction purports to require NFE to provide four escort tugs with 80 metric ton bollard pull capacity to escort LNG tankers in San

Juan Harbor, even though such escort tugs are not available in San Juan and are not required by the Coast Guard Captain of the Port or by the Puerto Rico Pilotage Commission. NFE and certain pilots have already demonstrated that four escort rated tugs currently available in San Juan Harbor with respective bollard pull capacities of 75 tons, 75 tons, 65 tons, and 61 tons have safely escorted LNG tankers four times in San Juan Harbor in compliance with the Coast Guard's Captain of the Port Orders and with the Puerto Rico Pilotage Commission directives.

## II. THE PRELIMINARY INJUNCTION

A copy of the Injunction is attached to this Motion as Exhibit 1.

The district court issued its Order today, about 7:30 pm on September 26, 2025. The Order describes its injunctive terms as a "TRO," but it was issued during a preliminary injunction hearing at which NFE was present and represented. The Order acknowledges it is "atypical, as it was filed in the midst of the preliminary hearing regarding this issue." Ex. 1 at 3. The Order says a TRO may be issued *ex parte*, but here the requirements of Federal Rule of Civil Procedure 65(b) for an *ex parte* TRO without notice to NFE are not met. NFE was present during the preliminary injunction hearings held over three and a half days, but the district court did not give NFE an opportunity to be heard. The court erred by not allowing NFE to present evidence or call any witnesses.

The district court erred by not requiring Plaintiffs to post security as required by

Rule 65(c). Rule 65(c) is mandatory. It says a court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c). The Order acknowledges that NFE's representative said a "seven-to-eight-figure bond" should be required for potential damages from an order preventing the imminent arrival and departure of LNG vessels. But the court erred by not permitting NFE to present evidence on the appropriate amount of security, and the court further erred by not requiring any security at all.

The injunctive aspect of the Order as to NFE says:

"Defendant NFEnergia shall continue conducting all maneuvers in accordance with the guidelines agreed upon with the San Juan Bay Pilots after the Houston simulations, which require the use of the 80-metric-ton bollard pull escort-rated tugboats to perform the maneuvers of the LNG vessels scheduled to transit with San Juan Bay during the next fourteen (14) days."

Dkt. 52 at 4. It is impossible for the vessel maneuvers needed on September 28, 2025 to be conducted in compliance with this Order because 80 metric ton bollard pull tugs are not available in San Juan Bay. The district court refused to allow NFE to present evidence and arguments on this point.

The Order fails to specify what irreparable harm could be inflicted by not granting a TRO or Injunction. It makes cursory reference to "irreparable harm," but then fails to describe what is this harm. *See* Dkt. 52 at 3. The Order erroneously refers to an alleged "agreement" between NFE and the Plaintiffs, but no such agreement

exists, and the district court refused to hear evidence from NFE regarding the absence of any such agreement.

For these reasons, the Order causes an emergency situation requiring stay of the Order as explained in this Motion.

### III. BASIS FOR IMMEDIATE EMERGENCY APPEAL

NFE has filed a motion to stay the injunction in the district court pursuant to Federal Rule of Appellate Procedure 8(a)(1). It is unknown whether the district court will rule on the motion to stay in time to prevent irreparable harm to NFE and the energy supply for the island of Puerto Rico, so this Motion is filed with the Court of Appeals on an emergency basis to seek stay of the Order in time for the LNG vessel maneuvers to proceed on Sunday morning, September 28, 2025. It would be impracticable to await a decision from the district court to either deny or grant the motion to stay the Order. This motion is filed in the court of appeals pursuant to Federal Rule of Appellate Procedure 8(a)(2).

An appellate court may review the grant of a temporary restraining order ("TRO") when the TRO might have an irreparable consequence and could be effectively challenged only by an immediate appeal. *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981). An order that is titled a TRO but possesses the qualities of a preliminary injunction is reviewable by immediate appeal. *Sampson v. Murray*, 415 U.S. 61, 86-88 (1974). The grant of a temporary injunction may be appealed as of

right pursuant to 28 U.S.C. § 1292(a)(1).

### IV. REASONS FOR GRANTING A STAY AND FACTS RELIED UPON

A Stay of the Injunction should be granted because allowing it to remain in place would disrupt fuel supply to the electric power generation plant, cause irreparable harm to NFE, and because the pilots have already been demonstrated that using the tugs currently available in San Juan Harbor is safe. It is impossible to comply with the Injunction in time to complete the two ship maneuvers that need to occur this Sunday, September 28, 2025. Furthermore, the Injunction is contrary to the U.S. Coast Guard Captain of the Port Orders applicable to these two ships, contrary to the applicable Puerto Rico Pilotage Commission directives, and it is unnecessary for safety purposes.

The district court erred by not allowing NFE to present *any* evidence in the three days it held hearing on Plaintiffs' motion. The only witnesses and evidence allowed were those presented by Plaintiffs. NFE was present at all three days of the hearing and repeatedly advised the Court it was prepared to present its witnesses and evidence. Nonetheless, the Court issued its Injunction without allowing NFE to present any witnesses or evidence. As discussed below, the evidence would have shown that the ship movements can been conducted safely without 80 ton bollard pull tugs, and in fact pilots have done so four times.

Certain Puerto Rico pilots participated in training simulations in Madrid, Spain that confirm the use of four 80 metric ton bollard pull tugs is not necessary. The recent

simulations confirmed that using four 50 metric ton bollard pull tugs is sufficient and safe, under appropriate conditions which comply the Captain of the Port Orders. The maneuvers to be conducted on Sunday will use four tugs with respective bollard pull capacities of 75 tons, 75 tons, 65 tons, and 61 tons, which the simulation and experience show are more than sufficient for safe vessel transits in San Juan Harbor.

Plaintiffs' allegations rely on outdated and flawed simulations conducted at the Seaman's Church Institute in Houston and a thirteen-year-old study in China regarding fire and explosion risks for LNG ships that is inapplicable. As explained in the Statement of Capt. Fulgencio Anavitate, a retired Senior Pilot of the Port of San Juan who participated in both the Houston and Madrid simulations, the Houston exercises relied on tug configurations tested under exaggerated and unrealistic conditions that bear no relation to present-day operations. *See* Ex. 2, Statement of Capt. Fulgencio Anavitate. One such assumption was the presence of a permanently moored Floating Storage and Regasification Unit ("FSRU") that would have severely constrained maneuverability, a project that has since been abandoned.

By contrast, the Siport21 Madrid Simulations of August 2025, conducted with local pilots, tug masters, and the LNG vessel's captain, confirmed that LNG carriers can be safely maneuvered in San Juan Bay using four escort-rated 50-ton ASD tugs. *See* Ex. 3, SiPort21 Final Report, at p. 48. The credibility of these results is beyond dispute. Siport21 is an independent maritime consultancy accredited by Det Norske

Veritas (DNV) and other internationally recognized classification societies for full-mission simulation and risk assessment studies.[1] Its methodologies comply with International Maritime Organization standards for port and tug-escort simulations and are relied upon by ports and LNG operators worldwide. These are not internal or self-serving assessments; they are third-party, accredited evaluations performed under rigorous international standards. The active participation of local pilots, tug masters, and the master of the LNG vessel further reinforces the reliability and impartiality of the findings.

The Statement of Capt. Fulgencio Anavitate further dismantles Plaintiffs' safety claims. Capt. Anavitate attended both the Houston and Madrid simulations and concluded that the Houston exercises were conducted under unrealistic assumptions; applied to a different vessel (an FSRU, not the Energos LNG tanker); failed to incorporate current dredging and channel conditions in San Juan, and, did not reflect the operational restrictions imposed by the USCG Captain of the Port Orders currently in effect (e.g., daylight-only, wind limits, safety zones). *See* Ex. 2, Capt. Anavitate Statement.

On the other hand, Capt. Anavitate found that the Madrid simulations reflected real-world conditions, modern tug capabilities, and validated navigational models.

---

[1] A classification society is an organization that develops and publishes standards, regarding the design, construction and certification of commercial vessels. These standards include technical requirements for a vessel's structure, essential engineering systems, and electrical system. 46 C.F.R. ¶8.100.

Capt. Anavitate's conclusion as to the safety of current operations with the use of the tugs available in the Port of San Juan is unequivocal:

> Based on my decades of experience, I conclude that LNG operations in San Juan can be safely conducted with **the current configuration of two ASD tractors of at least seventy-five (75) tons bollard pull, one ASD of sixty-five (65) tons, and one ASD of sixty (60) tons. This provides an aggregate bollard pull of approximately two hundred seventy-five (275) tons, which is exceeds the aggregate bollard pull of two hundred (200) tons used in the Madrid simulation, and which is sufficient under the environmental and operational conditions of San Juan**. Pilot skill, discretion, and judgment remain the foundation of safe operations, not artificially imposed hardware requirements.
>
> **Requirements for escort-rated tugs of eighty (80) or ninety (90) tons bollard pull are excessive, inapplicable to San Juan's confined, low-speed environment, and not legally binding.** The safe conduct of LNG operations depends on the professional skill and discretion of the pilots, operating within the oversight of the Pilotage Commission and the Coast Guard, rather than on exaggerated or commercially motivated equipment requirements.
>
> **I conclude that present tug assets and practices provide safe and compliant operations for LNG vessels in San Juan Bay.**

Ex. 2, at p. 5 (emphasis added).

Finally, the Declaration of Capt. Stephen Rivera provides a complementary, on-the-water perspective that further validates the safety of current LNG operations. *See* Ex. 4, Declaration of Capt. Stephen Rivera. Capt. Rivera is a retired senior pilot of San Juan Bay with decades of experience handling large tankers and container vessels, and he has directly participated in professional deliberations regarding LNG operations since their inception in the port.

In his declaration, Capt. Rivera confirms that he was present during the Siport21 Madrid simulations and attests to their accuracy and realism. He explains that the trials demonstrated conclusively that a four-tug escort configuration, all ASD tractor unit of adequate horsepower and bollard pull, affords safe margins of control for LNG carriers during docking, undocking, and channel transits in San Juan Bay.  Ex. 4.

Capt. Rivera further emphasizes that while pilots exercise professional discretion in handling vessels, the overarching rules governing tug requirements and safety parameters are established by the USCG and the Pilotage Commission. In his professional judgment, the current system—four escort-rated tugs, daylight and weather restrictions, and Coast Guard safety zones—provides safe, redundant margins of control for LNG carriers. He concludes unequivocally that Plaintiffs' assertion of unsafe conditions is contrary to both his direct experience and the objective evidence. Ex. 4

Together, these independent assessments—a DNV-accredited international simulation study, an expert evaluation by Capt. Anavitate, and firsthand pilot testimony from Capt. Rivera—decisively undercut Plaintiffs' claim of unsafe conditions.

## V. F<small>ACTORS TO BE</small> C<small>ONSIDERED IN</small> G<small>RANTING A</small> S<small>TAY</small>

"Different Rules of Procedure govern the power of district courts and courts of appeals to stay an order pending appeal. See Fed. R. Civ. P. 62(c); Fed. R. App.

P. 8(a). Under both Rules, however, the factors regulating the issuance of a stay are generally the same: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 n.3 (1st Cir. 2002); *In re Power Recover Systems*, 950 F.2d 798, 804 n.31 (1st Cir. 1991); *Ecker v. U.S.*, No. 01-11310, 2008 WL 7542252, *3 (D. Ma. July 24, 2008) (granting stay).

### A. Appellant is likely to succeed on the merits.

**1. Plaintiffs lack standing because only the U.S. Coast Guard and the Pilotage Commission have authority to prescribe navigation safety conditions.**

Plaintiffs do not have standing or the authority to mandate the use of 80 metric ton bollard pull tugboats. That authority is reserved to the Pilotage Commission of Puerto Rico ("the Commission") and the United States Coast Guard.

Article 5 of Law No. 226-1999 provides that the Pilotage Commission of Puerto Rico ("the Commission") has the authority to authorize, regulate, supervise, and sanction all pilotage activities within Puerto Rico's territorial waters. The Commission functions as the exclusive regulatory body with both administrative and disciplinary authority over the practice of pilotage in Puerto Rico. Moreover, under

Article 26 of Law No. 226-1999, the Commission has the power to adopt and promulgate any rules and regulations necessary to enforce the Act. In accordance, the Commission promulgated Regulation 7214-2006, which applies to pilots and vessels, and other persons, the owners or operators of tugboats or vessels for assisting in the maneuvering of vessels while transiting the navigable waters of Puerto Rico.

> Specifically, Rule 14 of Regulation 7214 states that:
>
> **Pilots on duty shall comply with the regulatory provisions imposed by the Coast Guard regarding the number and/or minimum horsepower of tugs to be used to assist vessels while transiting port waters**. In the absence of a regulatory provision imposed by the Coast Guard, but there is an agreement with the Agent or vessel regarding the number and/or minimum horsepower of tugs, the Pilot, the Agent, and the vessel shall abide by the stipulated agreement. All of this is without prejudice to the discretion that a Pilot must exercise to request the assistance of additional tugs when circumstances warrant it.[2]

According to Rule 14 of Regulation 7214, when there is a Coast Guard regulation in place, the Pilot is bound to follow the Coast Guard, not a pilots' association standards or operational agreements. Here, the Coast Guard has issued three Captain of the Port Orders, including Orders specific to the tugboats and other requirements for the M/V *Energos Maria* and the M/V *Energo Princess*. See Exhibits 5 and 6, Captain of the Port Orders dated April 11, 2025 and July 2, 2025.[3] The Captain

---

[2] Translation from the Commission's Opposition to Plaintiffs' Request for Temporary Restraining Order. Dkt.40 at p.7 (emphasis added).

[3] The hierarchy of provisions pertaining to shipping transit safety has the United States Coast Guard at the top (Captain of the Port (COTP) Orders, Marine Safety Information Bulletins) for

of the Port Orders are authorized by the Ports and Waterways Safety Act, 46 United States Code (U.S.C.) § 70002, and Title 33, Code of Federal Regulations (CFR), Part 160. When the Coast Guard sets navigation safety rules, those rules are controlling. Exhibit 7, sworn statement of Javier Figueroa Sosa. The Captain of the Port Orders including the following:

- Transits shall only take place between sunrise and sunset, and in the absence of any reduced visibility conditions.

- Transit, docking, undocking, and shifting within the port shall only take place when prevailing sustained wind is less than 10 knots and gusts are less than 15 knots.

- Transit, docking, undocking, and shifting within the port shall only take place with escort-rated **tugs of sufficient horsepower and bollard pull to the satisfaction of the pilot**.

- Per 33 CFR § 165.754, **a safety zone will be enforced during the transit, docking, undocking, and while the vessel is moored**. While moored, escort-rated tugs of sufficient horsepower and bollard pull must be readily crewed and available to adequately respond to any incident which may pose hazard to the moored vessel during the transit of other vessel traffic through the safety zone.

Exhibits 5 and 6 (emphasis added). Both Captain of the Port Orders remain in effect.[4]

These Captain of the Port Orders expressly apply to the M/V *Energos Maria* and the

---

rules applicable in this case to tug/escort requirements or environmental thresholds in federal channels. When the US Coast Guard sets conditions, those control. Proposals that function as navigation-safety rules, e.g. mandatory tug horsepower or escort classes, are properly handled with the COTP, not by Pilot's association standards or unilateral Commission rules. Exhibit 7, sworn statement of Javier Figueroa Sosa.

[4] Both Captain of the Port Orders state, "This order will remain in effect until released by me in writing. The Sector Command Center will inform you when I have issued the release for this order."

M/V *Energos Princess*, and they control for what escort tugs must be used for the LNG tanker movements that are necessary this Sunday, September 28, 2025.

Although Article 24(a) of Law No. 226-1999 permits pilots to organize into associations, such associations are not vested with regulatory powers. Only the Coast Guard and the Commission can issue binding tugboat standards. Pilots, individually or collectively, do not have the authority to mandate tugboat requirements, especially when they contradict orders from the Commission and/or the Coast Guard. The Coast Guard has issued its standards, and those standards are controlling. Therefore, Plaintiffs do not have standing to mandate the use of 80 metric ton bollard pull tugboats, nor do they have standing to request the Court to order the use of 80 metric ton bollard pull tugboats.

2. **Plaintiffs lack standing because they allege no concrete injury to themselves.**

Plaintiffs allege no injury caused by NFE and, therefore, Plaintiffs' lack standing to bring their complaint. The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'"[5] *Id.*

---

[5] If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[F]ederal courts exercise 'their proper function in a

(internal citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court. *Id.* Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id., at 561. The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.*

Allegations of abstract injury are insufficient to make out an injury in fact. Instead, the plaintiff "must show that he has sustained or is immediately in danger of sustaining some direct injury." *City of Los Angeles*, 461 U.S. at 101–02, 103 S.Ct. 1660 (citations and internal quotation marks omitted). Moreover, she must show that the injury or threat of injury is both real and immediate. *Id*. at 102, 103 (citations and internal quotation marks omitted). Standing involves both constitutional imperatives and prudential considerations. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982). An inquiry into standing must be based on the facts as they existed when the action was commenced. *Mangual v. Rotger–Sabat*, 317 F.3d 45, 56 (1st Cir.2003).

---

limited and separated government,' " (citing Roberts, Article III Limits on Statutory Standing, 42 Duke L. J. 1219, 1224 (1993)) *Id.* "Federal courts do not exercise general legal oversight of the Legislative and Executive Branches…"). *Id.* at 423-24. Note that the Coast Guard, as part of the Department of Homeland Security is part of the Executive Branch.

Courts reject standing where the alleged injury is not fairly traceable to a private defendant's conduct. In *Katz v. Pershing, LLC*, 672 F.3d 64, 79 (1st Cir. 2012), the First Circuit affirmed dismissal for lack of standing, holding that speculative fears of future harm from a data breach were not concrete injuries and were not traceable to the defendant's actions. Similarly, Plaintiffs' Amended Complaint lacks any allegation of concrete injury suffered by these Plaintiffs that is traceable to NFE's conduct, proving Plaintiffs lack standing.

Plaintiffs lack standing to assert "public safety" as a basis for emergency relief. Individual pilots are not empowered to regulate tug standards or to represent the people of Puerto Rico. That authority lies exclusively with the U.S. Coast Guard, which has imposed binding operational restrictions, and with the Puerto Rico Pilotage Commission. Plaintiffs' do not have standing to substitute their private preferences for the determinations of competent regulators. Plaintiffs do not have a cognizable injury.

Plaintiffs do not allege any non-speculative injury-in-fact suffered by these Plaintiffs, so they lack Article III standing, and there is no federal subject matter jurisdiction over their claims.

### 3. Plaintiffs' allegations about an agreement are a red herring

Plaintiffs allege they are suing NFE for breach of an alleged agreement to use only 80 ton bollard pull tugs, but this unsupported allegation gives them no standing because there is no such contractual agreement. Even if a contract existed, Plaintiffs

have not suffered any injury caused by breach of this alleged agreement.

This "agreement" argument is a red herring because Plaintiffs failed to, and cannot, offer any evidence establishing formation of the alleged contract by offer, acceptance, mutual assent, and consideration. Plaintiffs provide no evidence of what are all the terms of the alleged agreement. NFE denies that it ever agreed to provide 80 ton tugs for all LNG tanker transits in San Juan Bay.

It is true that NFE initially chartered four 80 ton escort tugs and they were used for some time in San Juan. But the owner of those tugs terminated the time charter parties, as the owner had a contractual right to terminate upon 75 days notice, and the owner ordered those tugs to depart from Puerto Rico on or about September 16, 2025. NFE has no contractual right or authority to call those tugs back, and it is believed their owner has contractually committed them to charters outside Puerto Rico.

**B.**     **Irreparable Harm Suffered by NFE if the Stay is Denied**

If the stay is denied, the Injunction will halt LNG operations in San Juan Harbor because it prevents NFE from bringing an LNG tanker to the berth in San Juan so it can discharge its cargo of natural gas needed to fuel the electric power generation plant. Halting LNG operations in San Juan places would inflict immediate harm on the people of Puerto Rico by disrupting the Island's fuel supply. Delivery of liquified natural gas is essential to Puerto Rico's power grid, generating electricity for hospitals, schools, businesses, and households. The Injunction would immediately jeopardize

that supply and undermine energy security.

Additionally, NFE wanted to present evidence to the district court proving damages caused by the Injunction being in place for only about 10 days will amount to approximately $22.9 million. But the district court did not allow NFE to present its evidence. Although this is admittedly monetary damages, there is no indication—certainly no proof—the Plaintiffs could ever satisfy this enormous monetary damages claim. Since Plaintiffs are unable to satisfy the damages caused by the Injunction, this injury to NFE would be irreparable.

### C. No Harm will be Suffered by Plaintiffs if the Stay is Granted

An order staying or suspending the Injunction will have no immediate effect on the Plaintiffs. The Plaintiffs, who are individual pilots, have refused to participate in four pilotage jobs of LNG ships which did not use 80 metric ton bollard pull tugs. Plaintiffs are not required to participate in navigation for movements of the two relevant ships on Sunday, September 28, 2025, and all indications are that Plaintiffs will not participate in moving the LNG ships this Sunday. Staying the Injunction will allow these two ships to depart and enter the harbor, but because the pilot Plaintiffs will not participate, staying the Injunctions will have no effect on them.

The San Juan Bay Pilots Corporation, another Plaintiff, would not suffer any injury, either. Although Plaintiffs allege a potential loss of income from loss of shared fees for pilotage services, that could be remedied easily by monetary damages. The

amount at stake for pilotage fees for moving the two ships on Sunday is estimated to be less than $10,000. In any event, NFE has no control over how pilots share pilotage fees, so this claim has nothing to do with NFE.

Plaintiffs allege only hypothetical risks based on outdated data and vague concerns that LNG operations "may" be unsafe. In reality, four LNG vessel movements have been completed safely and without incident under the current configuration.[6] Pilots conducting these maneuvers under valid Coast Guard Captain of the Port Orders and Pilotage Commission regulations face no risk of sanction. Speculative fears cannot establish irreparable harm.

### D. The Effect on the Public Interest Weighs Heavily in Favor of a Stay

The public interest will be served by granting the stay because the Injunction could cause severe consequences to Puerto Rico's population if LNG deliveries are interrupted. On the other side of the balance are speculative and nonjusticiable concerns advanced by individuals who lack standing to represent the public. This speculation flies in the face of actual up-to-date technical assessment and real world facts. NFE presented evidence that the necessary movements of the two ships on Sunday are the same maneuvers that capable pilots have already performed safely, without incident, four times using the tug configuration that can and will be used on

---

[6] LNG vessels have operated safely in Guayanila Bay for over 25 years with less capable tugs. *See* Exhibit 5.

Sunday.

The public interest in having a reliable fuel supply for the electricity generation plant to supply energy for the population of Puerto Rico weighs heavily in favor of granting the stay.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal of the district court's preliminary injunction.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 27th day of September 2025.

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing automatically to all counsel of record

*s/J. Ramón Rivera-Morales*
J. Ramón Rivera-Morales
USDC-PR 200701
Midtown Building 4th Floor
420 Ponce de León Ave.
San Juan, PR 00918
Tel. 787-510-8090 email:
rrivera@jgl.com