## DECLARATION OF CAPTAIN FULGENCIO ANAVITATE

I, Fulgencio Anavitate, of legal age, retired Senior Pilot for the Port of San Juan, Puerto Rico, under oath and subject to the penalties of perjury, hereby declare as follows:

### I.    Professional Background

I am a retired Senior Pilot of the Port of San Juan, with a total of 34 years of service as a federal and state licensed pilot, 24 years as a San Juan Bay Pilot and 10 years at other ports across Puerto Rico. I retired on January 3, 2025, pursuant to the mandatory retirement provisions of Article 16 of Act 226-1999, which require pilots to retire at the age of seventy. I was the first Pilot Commissioner appointed by the Governor of Puerto Rico as President of the Puerto Rico Pilotage Commission.

During my career, I handled a wide variety of vessels, including ultra-large container ships, petroleum and chemical tankers, post-Panamax cruise ships, roll-on/roll-off vessels, tug-and-barge combinations, and LNG carriers. Prior to becoming a San Juan pilot in 1991, I served as an ocean-going Tug Master and Docking Pilot in Philadelphia and later managed Crowley's Caribbean Division, where I oversaw a fleet of thirty-eight vessels, including harbor tugs in San Juan. I also worked as Mooring Master in the U.S. Virgin Islands conducting offshore ship-to-ship LPG transfers. I have extensive experience in tug operations for docking, undocking, escort, and barge handling operations.

Of particular relevance, for a period of ten years, I served as a pilot at the southern ports of Puerto Rico, principally Guayanilla, where I participated in an average of three LNG carrier arrivals per month, totaling approximately 360 LNG maneuvers. I participated in simulations in Denmark for the LNG Terminal, which is particularly challenging, as it is located at the entrance of the bay, surrounded by coral reefs, and exposed to swells, surge, wind, and currents.

Operational restrictions for these maneuvers included a maximum sustained wind of 25 knots and a deepest allowable draft of 38 feet (11.6 meters). Each maneuver required the assistance of four tugs: two ASD tugs with a bollard pull of approximately 50 tons, and two conventional twin-screw harbor tugs with a bollard pull of approximately 40 tons. When one of the 50-ton ASD tugs was unavailable, it was replaced by two additional twin-screw tugs of 40 tons each, making a total of five tugs.

Due to the complexity and exposure of the port, two pilots were always required to be present during LNG operations.

1

## II.    Participation in the Seaman's Church Institute Simulations in Houston, Texas

During my service in San Juan, I participated in simulations related to the New Fortress Energy (NFE) project at the Seamen's Church Institute (SCI) in Houston, Texas, along with the rest of the San Juan Bay Pilots. Those simulations modeled tug configurations with four ASD tugs of 80 tons bollard pull and four Rotor Tugs of 90 tons bollard pull. At no time were tugs of less than 80 tons bollard pull considered.

Configurations tested included:
- Tug (1) line on ship's bow.
- Tug (2) on starboard bow with a line.
- Tug (3) and (4) on stern.

Alternative:
- Tug (1) with a line on bow.
- Tug (2) on port bow.
- Tug (3) starboard bow with a line.
- Tug (4) stern line.

The Houston simulations reflected the then-proposed design of the New Fortress project: a Floating Storage and Regasification Unit (FSRU) positioned permanently alongside the Puerto Nuevo docks A and B, with visiting LNG carriers of approximately 920–970 feet arriving about every thirty (30) days. With a stationary LNG vessel moored at the dock, maneuvering space was drastically reduced. Additional Yokohama fenders, barges, and secondary fendering systems pushed the visiting LNG even further into restricted waters, tightening the maneuver considerably. I estimate that more than half of the simulations were focused on the maneuver of other vessels transiting near the FSRU, not the maneuver of the LNG tankers.

This configuration was never realized. The U.S. Coast Guard, Sector San Juan, denied the Letter of Recommendation because such an arrangement would have placed one of the vessels inside the federal navigation channel. Even smaller LNG versions of the FSRU concept were also rejected for the same reason. Despite the rejection, no adjustments were made to tug requirements, and simulation findings under those conditions continued to be used to justify exaggerated tug demands. These results were not transparently shared by the San Juan Bay Pilots, who continued to cite them as if still valid.

The present reality is entirely different: instead of a permanently moored FSRU with a visiting LNG carrier alongside, San Juan now receives a single LNG vessel

approximately every thirty (30) days, docking directly at the pier with far more available maneuvering space. For this reason, the findings of the Houston simulations cannot be directly applied. While some technical elements may remain of reference, the project shifted from a two- vessel arrangement to a single-vessel model.

Additionally, dredging at the Army Terminal Basin and other critical areas has improved safe maneuvering space, increased under keel clearance, and reduced risk factors. These improvements provide safer operational parameters not only for LNG vessels but also for all large ships in San Juan. Today's conditions are different, and in many respects safer, than those assumed in the original Houston simulations.

It is also worth noting that I objected to the tug setup of the Houston simulations, but the person in charge of the simulations dictated that it had to be conducted that way. I also objected to the testing of extreme risk scenarios, such as a ship losing propulsion while tugs remained fast forward. Such maneuvers are practically impossible with long heavy tow wires and simulated seas of 4–8 ft, which could cause the lines or bollards to fail. I also objected to 37 ft (11.2 m) drafts, insisting on limiting to 34–35 ft to allow emergency options such as anchoring or Graving Dock entry.

### III.    Participation in the SiPort21 Simulations in Madrid, Spain

I was later invited by NFENERGIA to participate in simulations at Siport21 in Madrid to provide my professional opinion. These simulations used four tugs rated at 50 tons bollard pull, operating at 75% (≈37.5 tons). The LNG vessel modeled was 285 m LOA, 43.4 m beam, and 9.1 m (30 ft) draft.

Tug configurations in Madrid differed substantially from SCI Houston:

Inbound:
- Tug (1) port bow line,
- Tug (2) starboard bow line,
- Tug (3) starboard quarter (secured at the basin),
- Tug (4) stern center line.

Outbound:
- Placements varied depending on wind conditions.

Madrid simulations reflected more realistic conditions — actual San Juan restrictions (30 ft draft, direct docking) compliant with current Captain of the Port Orders, not exaggerated SCI scenarios.

## IV.    Comparison of Simulations

The LNG simulations conducted at the Seamen's Church Institute in Houston used tug configurations that included four escort-rated tugs of 80 to 90 tons bollard pull, modeled under exaggerated and unrealistic conditions such as the presence of a permanently moored Floating Storage and Regasification Unit (FSRU). These scenarios are not reflective of current LNG operations in San Juan.

In contrast, the simulations conducted at Siport21 in Madrid reflected more realistic conditions, including a draft of 30 feet, direct pier docking, and tug configurations using four 50-ton tugs. These simulations more accurately represent current conditions, especially since dredging in San Juan Bay has improved maneuvering space and reduced risk factors.

Escort-rated tugs are designed for high-speed escort services in open waters, operating effectively at speeds of six to ten knots. San Juan transits, however, are carried out at speeds below six knots in narrow and confined channels. The advantages of escort-rated tugs are therefore diminished in San Juan. In my opinion, the local ASD tugs with bollard pull ranging from sixty to seventy-five tons, operated by experienced captains, are fully capable of providing safe LNG service in San Juan.

## V.    Improper Adoption of LNG Guidelines

Based on my experience as a pilot, only the Puerto Rico Pilotage Commission and the United States Coast Guard possess the authority to impose binding operational standards. Attempts by individual pilots or pilot associations to impose mandatory requirements, such as 80- or 90-ton tug specifications, were outside their authority and not legally valid. These proposed requirements were not technically justified and, in my view, were motivated by business considerations rather than navigational necessity.

## VI.    Conclusions

Based on my decades of experience, I conclude that LNG operations in San Juan can be safely conducted with the current configuration of two ASD tractors of at least seventy-five (75) tons bollard pull, one ASD of sixty-five (65) tons, and one ASD of sixty (60) tons. This provides an aggregate bollard pull of two hundred seventy five (275) tons, which exceeds the aggregate bollard pull of two hundred (200) tons used in the Madrid Simulation, and is sufficient under the environmental and operational conditions of San Juan. Pilot skill, discretion, and judgment remain the foundation of safe operations, not artificially imposed hardware requirements.

Requirements for escort-rated tugs of eighty (80) or ninety (90) tons bollard pull are excessive, inapplicable to San Juan's confined, low-speed environment, and not legally

binding. The safe conduct of LNG operations depends on the professional skill and discretion of the pilots, operating within the oversight of the Pilotage Commission and the Coast Guard, rather than on exaggerated or commercially motivated equipment requirements.

In summary, present tug assets and practices provide safe and compliant operations for LNG vessels in San Juan Bay.

## VI. Philosophy of Pilotage as Public Service

Throughout my career, I have regarded pilotage not as a business venture but as a public service. The core of the profession is to safeguard navigation, protect coastal communities, and ensure that Puerto Rico's lifelines of fuel, food, cargo, and tourism remain open and secure. Accepting a state license from the Puerto Rico Pilotage Commission was, to me, a commitment to serve the public good, not a platform for private profit. The very foundation of our licensing system exists to make pilots accountable to the people of Puerto Rico through their Commission, ensuring that the service is one of trust, safety, and integrity.

I have always understood pilotage as a calling that demands humility, technical skill, and dedication to the common interest. My guiding principle has consistently been service over business, duty over gain, and responsibility over ambition.

## VIII. Signature

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 24th day of September 2025, in San Juan, Puerto Rico.

Captain Fulgencio Anavitate

Retired Senior Pilot, Port of San Juan